## VICKIE L. TILLOTSON v. TRAVELERS INSURANCE COMPANY, Appellant.

### In Banc, July 3, 1924.

1. **ACCIDENT INSURANCE:** Burden of Proof. In an action on an accident insurance policy for the death of the insured by external violence and accidental means, alleged to have occurred by drowning in the Missouri River within seven years before the suit is brought, the burden is on the plaintiff to prove (a) that the insured is dead; (b) that his death was caused by external violence and accidental means, and (c) that his death was caused by accidental drowning in the Missouri River; and in this case, the evidence does not establish these essential facts of plaintiff's cause of action.

2. ———: Disappearance: Presumption of Death. Unless seven years have elapsed since the insured disappeared and he was last heard of, he is presumed to be still alive, and no legal presumption that he is dead arises prior to the expiration of seven years.

3. ———: Accidental Drowning. To constitute proof of accidental death by drowning, there must be substantial evidence that the insured accidentally fell into the water and was drowned, or that he was murderously assaulted and thrown into the water by his assailants, and then drowned.

4. ———: ———: Suicide: Presumption: Insanity. It cannot be presumed that the insured committed suicide in the absence of substantial evidence that he did. Besides, suicide in the absence of insanity is not accidental death.

5. ———: ———: Murderous Assault: Inference: Disappearance. The evidence in this case is not sufficiently substantial to sustain a conclusion or reasonable inference that the insured was murderously assaulted, robbed and thrown into the river; nor is there any direct or positive evidence that he was assaulted or was drowned, or that his body was ever in the river. On the contrary, all the facts which it is claimed point to a murderous assault, and robbery and drowning are equally consistent with a theory that he voluntarily disappeared.

6. ———: ———: ———: Circumstantial Evidence: Proof of Death. The evidence being wholly circumstantial, and no direct evidence that the insured was murderously assaulted and thrown into the river, and then drowned, the evidence must be substantial, in an action on an accident insurance policy, charging that he was accidentally drowned, that a dead body was found and identified as his body, or else it cannot be said that he was murdered or murderously assaulted. To establish the *corpus delicti*, in either a civil or criminal case, there must be substantial evidence; the rule requiring substantial evidence to establish death is the same in both kinds of cases, which is, that there must be some direct evidence that the victim was killed, or that a dead body was found and identified as his body, before the case can go to the jury on the question whether he was accidentally drowned, or murdered; his death cannot be presumed before the expiration of seven years after his disappearance.

7. ———: ———: ———: ———: ———: Inference Upon Inference. It cannot be presumed that the insured is dead and that he came to his death by accidental drowning, in the absence of substantial

evidence either of death or accident. Inference cannot be piled upon inference, and one presumption cannot be based upon another presumption.

Headnote 1: **Accident Insurance**, 1 C. J. secs. 284, 334.   Headnote 2. **Death**, 17 C. J. sec. 7.   Headnotes 3 to 5: **Accident Insurance:** 3, 1 C. J. sec. 334;  4, 1 C. J. secs. 108, 278;  5, 1 C. J. sec. 334.   Headnote 6: **Accident Insurance**, 1 C. J. sec. 334;  **Death**, 17 C. J. sec. 30.   Headnote 7:   **Evidence**, 22 C. J. sec. 27.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B. Allen,* Judge.

REVERSED.

*Mosman, Rogers & Buzard* for appellant.

The court erred in refusing to sustain defendant's demurrer at the close of plaintiff's case and in refusing to give defendant's Instruction D in the nature of a demurrer offered at the close of all of the evidence. (a)   The burden was on the plaintiff to prove not only the death of the insured, but that the death was caused by bodily injuries effected through external, violent and accidental means.   7 Cooley's Brief on Insurance, sec. 3156; Schmidt v. Indiana Travelers Acc. Assn., 42 Ind. App. 483; Tuttle v. Pacific Mutual Life Ins. Co., 190 Pac. (Mont.) 993; Laessig v. Travelers Pro. Assn., 169 Mo. 272; National Association of Railway Postal Clerks v. Scott, 155 Fed. 92; Johnson v. Etna Life Ins. Co., 101 S. E. (Ga.) 134; 1 C. J. 495; Keefer v. Pacific Mutual Life Ins. Co., 201 Pa. 448; Wright v. United Commercial Travelers, 188 Mo. App. 457; Freeman v. Royal Protective Ins. Co., 196 Mo. App. 383.   (b)   Plaintiff's case was made by building presumption upon presumption, in that from the facts adduced the death must be first presumed; and from death the accidental cause thereof must be presumed.   A presumption cannot be built upon presumption to support a case.   Removich v. Const. Co., 264 Mo. 54; Menteer v. Fruit Company, 240 Mo. 177; Swearington v. Wabash Ry. Co., 221 Mo. 644; Weber

v. Valier & Spies Mill Co., 242 S. W. 985; Warner v. Railway Co., 178 Mo. 125; State v. Lackland, 136 Mo. 26; Glick v. Railway Co., 57 Mo. App. 97; Hamilton v. Railway Co., 250 Mo. 714; Pippin v. Construction Co., 187 Mo. App. 360, 370; Phillips v. Travelers Ins. Co., 288 Mo. 175; Korprivica v. Standard Acc. Ins. Co., 218 S. W. 689; Atherton v. Railway Mail Assn., 221 S. W. 752; Byerly v. Light, Power & Ice Co., 130 Mo. App. 593. (c) The evidence of witnesses Wheeler and Paulson, to the effect that they saw the face or head of a man in the river is of no probative force. Richardson v. Sioux City, 172 Iowa, 260. And such evidence should not be considered in determining whether or not plaintiff made a case for the jury. Kane v. Mo. Pac. Ry. Co., 251 Mo. 13; Davidson v. Ry. Co., 207 S. W. 277; Nodaway County v. Williams, 199 S. W. 224; State v. Johnson, 225 S. W. 961; Morgan v. Brooks, 27 Mo. App. 487. (d) There is a presumption of continuance of life, hence that presumption obtains until overcome by proof of death. Plaintiff failed to overcome that presumption. 17 C. J. 1165; State v. Fielder, 210 Mo. 188; O'Gara v. Eisenlohr, 38 N. Y. 296.

*Culver, Phillip & Voorhees* for respondent.

(1) The court did not err in refusing to sustain a demurrer to the evidence. (a) There was abundant evidence to show that Tillotson was drowned by accident. The case is a much stronger one of circumstantial evidence than most of the cases hereinafter cited and decided by this court. These cases hold that both the fact of death and that it was accidental may be established by circumstantial evidence. There is no difference in this respect in this class of cases and any other. There was not only no motive for disappearance, but also the circumstances disprove it. If Tillotson himself undressed, tore his clothing and wearing apparel and scattered his papers and effects about to indicate a robbery

and is still alive, then he went forth naked into the world among strangers and without money or property. (b) Nor was plaintiff's case made by "building presumption on presumption." The only presumption instructed on was that if the jury found Tillotson was drowned, then it was presumed to be accidental, not suicide. (c) The evidence of Wheeler and Paulson that they saw the body of a man floating in the river subsequent to Tillotson's disappearance was a circumstance tending to prove plaintiff's contention that he had been drowned. It was just as admissible as the finding of the torn clothing, and personal effects, the habits and station in life of Tillotson, all of which were circumstances to be considered by the jury. The case of Richardson v. Sioux City, 172 Iowa, 260, cited by appellant, is not applicable. (d) Even if it is conceded, as appellant contends, that there is a presumption of continuance of life, that presumption was overcome by evidence showing death, which the jury were required to and did find. (2) There was evidence tending to show murder. This happened in the railroad yards on the bank of the Missouri River in a lonely spot. There was abundant evidence of a terrific struggle and robbery of Tillotson. The pocketbook had been rifled and the papers scattered about, but the only money found was one nickel. A man's body was later found floating in the river at the places and times where Tillotson's would probably have been if drowned as claimed. It does not appear that any other person's body was found or that any other person had been drowned about this time. No shots were heard and no blood was found in the vicinity or on the rocks facing the river bank to the water's edge. The most reasonable conclusion from this evidence is that those who committed the assault and robbery attempted to conceal the crime by putting Tillotson out of the way completely, and the most convenient means at hand was to drown him in the river.

SMALL, C.—I. Suit on an accident policy for the death of plaintiff's husband for the sum of $10,000, the

amount of the policy. There was judgment for the amount sued for, from which defendant appeals. The policy was issued April 21, 1919. The plaintiff was the wife of William L. Tillotson, the assured, and the beneficiary in the policy. The policy provided that the amount thereof should be paid to' the beneficiary upon the death of the assured during the life of the policy, which was for one year from its date, in the event the assured should die "from bodily injuries affected directly and independently of all other causes through external violence and accidental means." The petition further alleged that, "on the 30th day of August, 1919, while said policy was in full force and effect, said William L. Tillotson, deceased, lost his life and died at St. Joseph, Missouri, from bodily injuries, affected directly and independently of all other causes through external violence' and accidental means, to-wit, by drowning in the Missouri River."

The plaintiff had property and money amounting to about $18,000 at the time of the marriage, which she had when Tillotson disappeared. He never used or lost any of it. Tillotson, when he married, had some property, a ranch of about 600 acres in Wyoming, and a considerable estate which he had inherited from his mother. But he lost most' of his property or lived it up before the policy sued on was taken out. His last business or employment before his disappearance was managing the real estate department of a bank or trust company in Denver. When he disappeared, and for some time before, he had a third interest in a fund of $70,000, the income of which he held in trust for his aunt, who was eighty-five or eighty-six years old, and at her death the principal became the absolute property of himself and his two sisters in equal shares. In May, 1919, Tillotson had to his credit in a bank at Denver between $2300 and $2400 of his own. He afterwards gave $700 of this to his wife. He was forty-two years of age. There is no evidence he ever threatened suicide. His health was

good and his family relations were pleasant.   In that month, May, 1919, he and his wife, and her daughter by her first husband, took a trip, he paying. the expenses, she returning a substantial part of the $700 he had given her near the end of the trip.   They went South, visiting some of Mrs. Tillotson's relatives, and from thence East, to visit relatives of the assured.   They remained about three months, when they started West and stopped at St. Joseph, Missouri, on August 26th, where they visited at "the old Col. Gates's home."   Mrs. Tillotson was a granddaughter of Colonel Elijah Gates.   On August 30, 1919, the wife and her daughter, Helen, went to Kansas City on the 11:30 A. M. interurban train.   Tillotson accompanied his wife to the station, with Burr McCarty, his wife's nephew.   Tillotson and McCarty, after the train left, went to a near-by drug store and bought some cigars and cigarettes, where Tillotson used the telephone (but to whom he was talking or intended to talk does not appear), and then returned to the Gates home for the mid-day meal.   Tillotson left after dinner about 1:30 P. M., and was never seen thereafter.   He and his wife had planned to return to Denver the next Sunday or Monday night after her return from Kansas City.   After his disappearance, his account as trustee of the $70,000 was intact.   He had $855 in bank to his credit, as such trustee, subject to his check.   He owed about $650.   At the time of his disappearance he had a $20,000 life insurance policy, which had been taken out seven or eight years before, which had a loan value of $1600 or $1700. He had a paid-up policy of life insurance for $5000, more than twenty-two years old, which had a loan value of $2500, and on which he had obtained a small loan from the company.   He also had a $5000 policy, taken out three years prior to 1919.   He had about $600 or $700 with him, when he disappeared, besides a gold watch and personal jewelry.   On cross-examination of one of plaintiff's witnesses, it was shown that these three life policies had been paid to Mrs. Tillotson, the beneficiary of them, she hav-

ing given satisfactory bond with security, conditioned that she would re-pay the money, if Tillotson "turned up" in seven years.

Shortly after 2:15 p. m. on the same afternoon Tillotson disappeared, Hape, a Union Terminal trackwalker, patrolling the railroad track along the bank of the Missouri River in the railroad yards at the foot of Locust Street in St. Joseph, found a hat, coat and trousers and a pocketbook containing no money, which was afterwards identified as belonging to Tillotson, and which he had on his person when he left the Gates home about half or three quarters of an hour before. These articles were found between the railroad track and the water's edge, and some on the rocks which riprapped the river bank. The coat and trousers were considerably torn in places, and the necktie had been ripped apart. The trackwalker Hape's testimony was substantially as follows:

On the afternoon of August 30, 1919, he found a pocketbook, hat and coat, also a tie and a cigar, on the river bank, half way between the railroad track and the rock dike. He did not notice the time when he stopped there, but did when he left, and it was 2:15 p. m. He looked at his watch as he went away. He had stopped there probably ten minutes. The tie was on the rock dike, the hat four to six feet north of the coat, and the coat six to eight feet from the rocks. The tie was on the rocks west of the coat, about in the middle of the dump. It had been torn to pieces, as though it had been jerked off the neck. The piece around the neck was broken, but it was all there, and remained tied. The witness opened the pocketbook to examine its contents. He found some receipts and business and lodge cards of different kinds. Tillotson's name was on the cards. The cards and papers found were not all in the pocketbook, some were scattered about on the ground. One of the cards was a certificate of registration in the draft for the World War; one was a receipt for dues paid to a Masonic order. The place

where he found these articles was about the foot of Locust Street. These articles were all introduced in evidence, after being identified by the witness as those he found on the river bank. The coat and trousers were badly ripped, and the necktie also, when he found them, and in the same condition as when shown to witness at the trial. A cigar was near the necktie on the rocks. Two men followed him down to where he discovered these articles. He did not know them. They looked around at him, and said they would not have anything to do with it, and went on south. He didn't see them any more.

Cross-examination: These two men looked like they were laboring men. They said they were going across the river to get a job. He saw the coat and hat about ten or twelve feet west of the railroad tracks. The bank of the river was about thirty feet from the tracks at that place. There were bushes growing on the bank, pretty thick at that time. Nothing was hanging on the weeds or bushes. He examined the bank and the weeds to see whether anybody had been in there or not—to see if he could see anything of anybody going over this rock business, over the bank. He saw no sign of anybody going through the weeds, except where he saw the articles. They were in a small bare place, where there were not many weeds between the tracks and the rocks. The pocketbook was between the coat and the hat—between the coat and the track. He looked for blood stains and indications of that kind, and could not find any. He just walked down and glanced around. He saw no tracks or indications that anybody had been down on the stones. He just looked around between where the articles lay and the river. Looked right in the neighborhood of the hat and the coat, to see whether anybody had been down there, and saw no tracks of any kind. Didn't see the bushes or weeds broken or tramped down. Did not see any signs of any scuffle or fight. He looked for it at that time. It did not seem as though those things had been thrown there. It seemed like somebody had a

scuffle and had thrown them off. "They got there some way. I don't know how they got there. Q. But you saw no signs of 'a scuffle or anything like that on the ground? A. It did not seem like it, no sir."

Re-direct examination: "I found no money in the pocketbook, and no money around there at all. The policeman found a nickle there the next day."

Mr. Joel Gates testified for plaintiff: After dinner, about half-past one, on August 30, 1919, Tillotson came out to the garage, where he and his nephew, McCarty, and his brother, Charles, were, and said something, he did not recall what it was, and then went away. That was the last he ever saw of Tillotson. He had expected him back that evening for supper. Witness became uneasy about Tillotson's failure to return, and went over to the police station, where he inquired if there was any report of any accident to any person. He was informed there was no such report. Tillotson not appearing that night, witness called Captain Watson at the police station the next morning (Sunday), and said that his sister's husband had been gone all night and perhaps something might have happened, and asked if the officers had heard anything about him. Asked if his name was Tillotson, Gates replied, yes; Captain Watson then said, "We have a coat and hat here that we found on the river bank." Witness answered him, "Well, Captain, there is no need of going any further, I will come right over." Witness then went over to the police station and found the coat and hat, also a pocket book, and recognized the clothes as clothes he had seen Tillotson wear. But he was unable to say that they were the same clothes that Tillotson had on, when he left the garage. But they were identified by other witnesses as clothes he wore that morning. From the police station, Gates went with some city detectives to the Missouri River bank. On the rocks composing the riprap that slopes down the bank, he found a necktie. It was tied in a hard knot at one end, and the other end had been broken loose; both pieces

were there. But he did not recognize the tie. He also found a buffalo nickel, also two or three cards around in the weeds with Tillotson's name on them. The pocket book, which he saw at the police station, and identified as Tillotson's, contained a check for three dollars to Tillotson, made by his wife, and a picture of his wife and her daughter, and of a baby (a relative of Tillotson's), which witness did not recognize. Also a membership ticket in the Chicago Board of Trade, and in a Masonic order. Witness further testified that he continued to search for Tillotson, and offered a reward for information regarding him. Also called up Kansas City relatives, where Mrs. Tillotson was staying, and asked if Tillotson had been there, and found he had not. Mrs. Tillotson returned to the Gates home from Kansas City on Monday, the second day after his disappearance. Gates offered a reward of one hundred dollars on his own account, and published it in the St. Joseph Gazette the next morning. Afterwards, the reward was increased to $1,000. It became Associated-Press news and was published throughout the country. Gates also had the river dragged near the place where the articles of apparel of Tillotson were found in St. Joseph, within two days after he last saw him, and also examined the place where young Miss Wheeler and Paulson afterwards saw a dead body in the Missouri River, on the Missouri side, a few miles south of St. Joseph. But all his efforts were in vain. No further information as to Tillotson was obtained. Tillotson had visited Mr. Gates eight or nine times before, he knew him well, and was very fond of him—thought he was a model man. But he knew nothing of his business affairs.

On direct examination Mr. Gates testified: He made an affidavit on the 24th of November, 1919, in which he stated, that he was "thoroughly convinced" that Tillotson committed suicide by drowning himself in the Missouri River. In said affidavit, he stated: "When Mr. Tillotson left the house on Saturday afternoon, he told

304 Mo.—32.

my sister, Mrs. Luella McCarty, that he was going up town, amongst other things, for the purpose of getting a suit of clothes that he had left at a tailor's or cleaner's to be cleaned and pressed. This suit consisted of a coat and pants and the vest to the suit was still in my house in his trunk. Mrs. Tillotson in the meanwhile had returned from Kansas City and she gave me the vest, which I took to police headquarters and requested Chief of Detectives Johnson to have a search made to ascertain if any cleaner had cleaned and pressed such a suit of clothes. I also started an investigation through the detective department and all other ways that I could think of to try to obtain some trace of Mr. Tillotson and to find his body, as I was by this time thoroughly convinced that he had committed suicide by drowning in the Missouri River.''

On cross-examination Gates testified: That he had since changed his mind, because ''Tillotson might have been killed and thrown in the Missouri River, instead of committing suicide.'' That there was not any motive for his committing suicide. That ''I have since learned that there was no such motive. That is the reason for my belief, that he may not have committed suicide, when I made the affidavit. At the time I made that affidavit, there were just three things in my mind that could have happened to Tillotson. He might have run away, and he might have committed suicide, or he might have been murdered. I don't know why they ever got that in that affidavit, to tell you the truth about it. But I certainly dictated it and signed it without any assistance, nobody was using any language for me. Those were my own words, selected by me and I carefully read it over and signed it. That is right. I don't know why I should have done so. I don't know why I did that.''

Plaintiff's evidence also showed that a suit of clothes, different from those Tillotson had on when he disappeared and found on the river bank, had been previously sent to the cleaners by Tillotson, but they were not at

the cleaners after his disappearance, plaintiff's witness How stating without objection that the employees of the cleaners said the clothes were called for by a man in the afternoon, between twelve and three o'clock of August 31, 1919, but they couldn't and wouldn't attempt to describe the man, except to say the same man took them away that brought them there. (The cleaners were not called as witnesses by either party). Plaintiff's evidence also showed that Tillotson had been to or near the place where his cothes were found in the railroad yards, a few days before, when he and Mr. Gates were taking a walk.

There was evidence, in plaintiff's case, that a number of years before Tillotson had dealt some on the Chicago Board of Trade, but not recently, further than a couple of deals, in which he made a loss of about $200, one hundred dollars of which he had not paid when he disappeared.

Other evidence for plaintiff tended to show that the articles when found on the river bank were torn and injured. A piece of cloth, part of the cuff of the pair of trousers, had the appearance of being ragged or torn, and the coat and trousers were torn, partly in two. But no blood was shown to have been on the clothing, or anywhere upon the rocks or ground or on the river bank. The river bank was faced with riprap work, some of the rocks quite hard, which would not likely leave marks of people walking over them.

Henrietta Virginia Wheeler testified for plaintiff. in substance, that in September, 1919—September 4th —she was at her brother's home on Lake Contrary, three or four miles south of St. Joseph, near the Missouri River. She went down to the river bank, and while at the end of a river launch, digging around in the water with a stick about four feet long, a white object came down the river with the current. She wanted to see what it was, and turned it over with the stick and distinguished the features of a man. The boat was about sixteen feet

long, and the bow was at the bank, and the stern, where she was, out in the river. She ran up to tell her sister-in-law about it right away, and they both went back to the river, but the current had already taken the object down the river. Couldn't see anything of it. She got clear enough view of the object, when she saw it, to know that it was a person. Her sister-in-law afterwards called up Mr. Gates and notified him of finding the body. Cross-examination: It was a human head that she saw—a man's head—the face was purple. There was no hair on the head. (The plaintiff's other evidence showed Tillotson had a full head of hair—blond). She remembered that well. She saw no part of the body except the head. She just saw the head coming down and it looked like a white barrel at a distance, and then, when it got down closer, it was smaller. It came within about two feet of her. When her brother came home, they told him about it, and they went over in his boat and used the seine and tried to find it, that same afternoon. She did not know that it was a common occurrence for a dead body to be floating down the river. She never saw any before.

On November 2, 1919, one Paulson, a witness for plaintiff, testified that, while duck hunting, he discovered a body lodged against some drift in the Missouri River at a place about seven miles south of the city of St. Joseph. The body was badly decayed. He was unable to get it out of the river. He went for assistance, but when he returned the body had disappeared and could not be located. He could not identify the body nor describe it with any particularity. Could not tell whether it was a man or a woman, black or white, child or adult.

There was medical testimony on both sides, that bodies, after remaining in the river for three days to several weeks or months, if not held down in some way, will rise to the surface and float away on the current. Also, that dead bodies floating in the Missouri River are seen occasionally. A witness for defendant, its only wit-

ness except the above medical testimony, testified: That Tillotson was in a drug store about a block from the Gates home, after two P. M., on the day of his disappearance, and purchased some small articles.

The above is the substance of the testimony in the case. At the close of the plaintiff's evidence, and of all the evidence, defendant asked a demurrer to the evidence, which the court refused.

II. This being a suit on an accident policy for the death of the assured by external violence and accidental means, the burden of proof is upon the plaintiff to prove two essential facts necessary to her cause of action: first, that the assured was dead, and, second, that his death was caused by external violence and accidental means, and in this case, under the allegations of the petition, that his death was caused accidentally "by drowning in the Missouri River." This burden does not shift, but remains throughout upon the plaintiff. [Griffith v̌. Ins. Co., 235 S. W. l. c. 85, opinion by RAGLAND, J.; Laessig v. Ins. Co., 169 Mo. 272; Phillips v. Ins. Co., 288 Mo. 175; Brunswick v. Ins. Co., 278 Mo. 154.]

*Burden.*

III. As seven years have not expired since Tillotson's disappearance and he was last heard of, he is presumed to be still alive, and there is no legal presumption of his death merely from lapse of time, prior to the expiration of said seven years. [Lawson on Presumptive Ev., p. 521.]

*Presumption of Death.*

IV. To constitute proof of accidental death by drowning, as alleged in the petition, there must be substantial evidence that Tillotson accidentally fell into the water and was drowned, or that he was murderously assaulted and thrown into the river by his assailants and drowned.

*Accidental Drowning.*

First, as to whether Tillotson accidentally fell into

the river and was accidentally drowned: All the evidence is circumstantial. While learned counsel for respondent claim generally that he may have fallen into the river and been accidentally drowned, they do not point out any circumstance in the record tending to prove it. Tillotson obviously did not fall in the river with his clothes on, because they were on the river bank. Nor is it consistent with reason that he tore up his clothes, as the evidence shows they were torn, and scattered them upon the river bank and then went in bathing near midday in a public place in the city and was accidentally drowned. Nor will suicide be presumed, and there is no substantial evidence of suicide. Besides, suicide in the absence of insanity would not be accidental, and there is no claim or evidence of insanity in the case.

We must hold, therefore, there was no substantial evidence, in the circumstances shown in the record, of Tillotson's being accidentally drowned by accidentally falling into the river.

V. The principal insistence of learned counsel for plaintiff is, that Tillotson was murderously assaulted and thrown into the river and drowned, and that his coat and trousers were stripped from his body and badly **Murderous Assault.** torn, and his pocketbook taken from him, in the struggle he made with his murderous assailants. If this were true, it would constitute accidental death, within the terms of the policy. But we hold that there is no substantial evidence of such murderous assault and drowning of Tillotson. It is true, plaintiff's evidence shows his clothing was badly torn and his pocketbook empty. But it is also true that it shows the place on the river bank, where they were found, indicated no signs of the struggle, which must have been of a strenuous character to tear and strip his trousers, as well as his coat, from his body. The weeds and the bushes were not trampled down, and there was no blood on the ground or the rocks where his clothing was found or nearby, nor was there any evidence intro-

duced, showing any blood upon his clothes, so found, or that anyone heard any outcry. All the indications of a murderous attack and struggle are seemingly missing. On the other hand, there is much in the circumstances to show that Tillotson may have voluntarily disappeared. A most thorough search was made for his body, and it could not be found. There was evidence that he had a suit of clothes at the cleaners, when he left the Gates home, which he said he was going to get, and which he did get, between noon and three o'clock in the afternoon of the day of his disappearance. This suit of clothes and the six hundred dollars in money, and his gold watch and jewelry, which he had when last seen, were never found. If he desired to voluntarily disappear, he could easily have changed his clothes, torn up the clothes he had worn, without shedding any blood or making any outcry and throwing them with his empty pocketbook on the river bank, and then disappear, wearing the clothes he got from the cleaners and retaining his six hundred or seven hundred dollars in money, and his watch and jewelry, which would materially aid him in departing for parts unknown. Tearing up the clothes he had worn and scattering them, with his empty pocketbook, on the river bank, would tend to mislead and mystify those who would search for him—which he naturally would attempt to do, in case, for some hidden reason, he desired to sink out of sight, as many others have done before him. We think there is no substantial evidence or circumstance tending to show that Tillotson was murdered or assaulted and thrown into the Missouri River, and then drowned.

There being, therefore, no substantial evidence of Tillotson's death by accident, the defendant's demurrers to the evidence should have been sustained.

VI. Another view is this: The evidence being wholly circumstantial, and no direct evidence that he was murderously assaulted and drowned, there must have been substantial evidence that a dead body was found

**No Proof of Death.** and identified as his body, before the charge that he was murdered was sufficiently sustained by the evidence to go to the jury. It is true that, in civil cases, a charge of crime need not be proved beyond reasonable doubt, and that a preponderance of the evidence is sufficient. [State ex rel. v. Ellison, 268 Mo. 239.] But whether there is substantial evidence, or what is the same thing, sufficient evidence to go to the jury to establish the crime charged, must be the same, whether the case is tried in a criminal or civil court. In either case, there must be substantial evidence of the alleged victim's death. Seven years since his disappearance not having expired, he is presumed to be still alive. [Lawson, on Presumptive Evidence, supra.] Whether he is dead cannot be submitted to a jury, as a mere matter of guess and conjecture. [Atherton v. Ry. Mail Assn., 221 S. W. 756; Phillips v. Ins. Co., 288 Mo. 185.] In criminal cases, where the evidence is all circumstantial, even when the defendant makes an extrajudicial confession of the murder charged against him, the law, in addition to his confession, requires strict proof of the *corpus delicti,* that is, some direct evidence that the alleged victim was killed, or that a dead body was found and identified as his body. Otherwise, mere circumstantial evidence will not constitute substantial evidence of murder to go to the jury. [State v. Bowman, 243 S. W. (Mo.) 114 *et seq.*] We do not see why the same rule should not obtain in civil cases, where there is no confession of anyone to a murder and where the evidence is wholly circumstantial, except that, in civil cases, the *corpus delicti* need not be proved beyond reasonable doubt, but it is sufficient, if proved by the preponderance of the evidence to the satisfaction of the jury. But in either case, where murder is charged, there must of necessity be substantial evidence of the *corpus delicti* to take the case to the jury. There is no such evidence in this case, and for this reason the plaintiff's evidence wholly fails to prove the murder of Tillotson as contended for by learned counsel.

VII.  In this case, too, to hold that plaintiff had made out a case for the jury, we should have to presume, without substantial evidence of the fact, that Tillotson was not only dead, but also that his death was accidental, by accidentally falling into the river, or by being feloniously thrown into the river and drowned, and thus find the two crucial and essential facts, which constitute plaintiff's cause of action, from a presumption, based upon a presumption, and pile inference upon inference, which is not admissible in such cases.  [Phillips v. Ins. Co., 288 Mo. 175.]  In our opinion the judgment below is not warranted by any substantial evidence in the case, and the defendant's demurrers to the evidence should have been sustained.

*Inference upon Inference.*

The result is, the judgment appealed from should be reversed.  It is accordingly so ordered.

PER CURIAM IN BANC:—The foregoing opinion of SMALL, C., is adopted as the opinion of the Court in Banc. *Graves, C. J.,* and *David E. Blair, Walker* and *Ragland, JJ.,* concur; *James T. Blair* and *White, JJ.,* concur in reversing the judgment, but think the cause should be remanded. *Woodson, J.,* dissents.