No. 34,753

LYDIA M. McKENZIE, *Appellant*, v. THE NEW YORK LIFE INSURANCE COMPANY, *Appellee*.

(112 P. 2d 86)

Opinion filed April 12, 1941.

*A. J. Herrod, Charles F. Williams* and *George E. Gard,* all of Kansas City, for the appellant.

*Willard Phillips,* of Kansas City, *Richard S. Righter* and *Horace F. Blackwell, Jr.,* both of Kansas City, Mo., for the appellee; *Louis H. Cooke,* of New York, N. Y., of counsel.

The opinion of the court was delivered by

HOCH, J.: This was an action on a life insurance policy to recover the double indemnity, payable in case of accidental death. A demurrer was interposed at the close of plaintiff's evidence, was taken under advisement until the close of defendant's evidence, and then sustained. From that order plaintiff appeals.

On September 25, 1934, at about four-thirty in the afternoon, Dr. Henry S. McKenzie was found dead, lying on the floor of his office in Kansas City, Kan. He had been dead for many hours. For a number of years he had held a policy of insurance issued by the New York Life Insurance Company, the appellee, which provided for payment of $5,000 in case of natural death and $10,000 for ac-

cidental death. Claim for $5,000, together with proof of natural death, was made on October 2, 1934, by Lydia McKenzie, the widow and beneficiary. Submitted as proof of death was a statement by Dr. E. D. Williams, coroner, who had conducted a post-mortem examination, in which statement immediate cause of death was given as "acute dilatation of heart; acute myocarditis." To the question as to how long, in his opinion, the deceased had suffered from the disease, Doctor Williams replied: "Unknown." And to the question, "If death was due to accident give full particulars and date," he answered: "No." Within a few days after proofs were furnished the company sent the beneficiary a check which she cashed for $5,224.25. This amount included incidental benefits in no way connected with "accidental death." The check carried the notation on its face "in full settlement of all claims" under the policy.

About four months later, on February 8, 1935, an attorney representing the beneficiary wrote to the company stating that "a short time ago the true facts were revealed to Mrs. McKenzie and she learned for the first time that Doctor McKenzie had died as a result of an accidental injury." The letter asked that forms upon which to make proof of accidental death be furnished. On February 18 the attorney wrote to the company more at length. At the moment we need only note that in this letter the contention was made that the insured had died as a result of taking "a barbital solution" as a sedative to his nerves, and that examination would reveal that he had "died of what in law is known as accidental injury rather than natural death." To the letter of February 8 the company replied that the proof of death had clearly established that death was due to acute myocarditis, that the coroner, who had known the deceased for twenty-four years, had made affidavit that death was not due to accident, and that the company had no printed forms for making proof of accidental death.

Sixteen months later, on June 30, 1936, action was begun for the recovery of the additional $5,000—which amount was subsequently reduced to $3,000—in which it was alleged that when the deceased was found he had an unusual pallor; that he had a bump from a recent bruise on his head; "that there was a small water glass on the floor close to his right hand stained with the remains of a brown colored fluid, which plaintiff at this time is informed is a derivative of a *medicine called barbital*"; and that *"the death of the insured was caused by an accidental overdose of this solution."* (Italics ours.)

About ten months later, on April 23, 1937, an amended petition was filed in which there was no allegation that death had resulted from an overdose of barbital or other medicine, but in which it was alleged that the insured "sustained . . . bodily injuries the exact cause of which is not known to plaintiff and for that reason not set out herein, but effected solely through external, violent and accidental means."

Two years and a half thereafter, on October 17, 1939, appellant filed a second amended petition in which the cause of death was alleged, for the first time, to have been an accidental overdose of "a medicine commonly called *bromides*." (Italics ours.)

In addition to general denial, the answer denied that the claimant had submitted proof that death "resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means"; denied that death had resulted from an accidental dose of "bromides," but alleged that if death was so caused, it resulted from the taking of "poison" within the meaning of the policy; and that claimant had executed a full and valid release from any further liability on the policy by the insurer. In reply the claimant denied that she had failed to submit proof of accidental death, and alleged that by its declaration that the insured had died from acute heart trouble, and its denial of any further liability on the policy, the company had waived the furnishing of further proof of loss under the double indemnity provision that the purported release was signed under a mutual mistake of fact as to the cause of death, that it was without consideration and asked that it be set aside.

Trial was had in October, 1939. As hereinbefore stated, defendant's demurrer to the evidence, interposed at the conclusion of plaintiff's evidence, was sustained after defendant had submitted its evidence. The trial court said:

"At this time the court is of the opinion that the demurrer offered by defendant at the close of plaintiff's case should be sustained and the same is sustained.

"The court is of the opinion that the release pleaded by the defendant is good—that no evidence sufficient has been adduced under the law for the court to set this release aside, or to show a mutual mistake of fact."

The trial court did not say that the demurrer was sustained solely because of the release. If we should assume, however, that that was the only reason the court had in mind, we would still be faced with the rule that if a ruling or order from which appeal is taken

was properly made, the reason assigned therefor is not of controlling importance. (*Turner v. Jarboe*, 151 Kan. 587, 591, 100 P. 2d 675; *Stutz v. Douglas County Comm'rs*, 139 Kan. 135, 137, 29 P. 2d 1094.)

Appellant's contentions may be fairly summarized as follows: (1) By denial of liability on the ground that the deceased died a natural death and not an accidental one the defendant waived its right to plead the purported release as a defense; (2) the purported release did not in fact constitute a release; (3) the question of whether there was such mutual mistake of fact as would avoid the release should have been submitted to the jury; (4) the purported release was void for want of consideration; (5) an accidental overdose of medicine resulting in death constitutes accidental death by external, violent and accidental means; (6) there was evidence sufficient to require the question of whether death was caused by an accidental overdose of bromides to be submitted to the jury.

The conclusion presently to be stated as to sufficiency of the evidence to require submission of the case to the jury makes it unnecessary to extend this opinion by the lengthy discussion which would be necessary to consider adequately the other contentions.

Narration of a few additional facts should first be made. Doctor McKenzie shared a suite of offices with Doctor Daly, a dentist, a common reception room being used. The office attendant, who was on duty on September 25, 1934, testified that she did not know that Doctor McKenzie had been in his office that day until she received a phone call for him from Mrs. McKenzie at 4:30 in the afternoon and went into his private office where she found him dead upon the floor. She had last seen him before seven o'clock the preceding evening when he was lying down in his office. Doctor Daly had last seen him about the same time. Mrs. McKenzie testified that she had had a phone talk with Doctor McKenzie about seven o'clock the preceding evening, when he had called her; that at about eleven o'clock in the evening she called him when their dog bit her daughter, but that when he answered he was not normal; that "he was talking thick-mouthed, and his tongue was kind of thick and he seemed to jerk his words"; that he prescribed something for the bite but she didn't use it, as she wasn't sure she knew what he was telling. She heard nothing further about him until she learned of his death the next afternoon.

Doctor Williams, the coroner, who had practiced medicine for more than thirty-five years, viewed the body at the office, and later

made a post-mortem examination, assisted by Doctor Harless, a pathologist, and executed the death certificate. He examined the vital organs and tissues, including the heart, lungs, liver and kidneys. He certified that the cause of death was acute myocarditis and acute dilatation of the heart. He testified that in the autopsy they found "chronic myocarditis, hypertrophy of the heart, chronic sclerotic endocarditis affecting the mitral valve, early fatty intimitis of the coronary artery, pulmonary congestion and edema." No chemical analysis of the stomach was made, for the reason, as he testified, "we were satisfied the findings in the autopsy were sufficient to account for death."

Dr. W. R. Wahl, professor of pathology and dean of the University of Kansas Medical School, made laboratory tests of the vital organs, prepared and signed the autopsy report. In addition to acute and chronic heart disease and the other findings of Doctor Williams, he found "parenchymatous degeneration of the liver, kidneys and heart" and other disorders not here necessary to recite.

Although Doctors Williams and Wahl were witnesses for the appellee, appellant submitted Doctor Williams' report and proof of death with her claim, and the diagnosis and report by Doctors Williams, Harless, and Wahl were submitted as an exhibit by appellant. Appellant testified, however, that she did not know that in the proof of death Doctor Williams had stated that death was due to acute dilatation of the heart and acute myocarditis; that she "didn't pay any attention to what his death was due to"; that she "didn't know anything about it, the autopsy or anything"; that she made no inquiry into the cause of her husband's death; that she didn't ask the coroner or any physician what disease he died of; and that "I found out what was considered to have been the cause of death three or four months later." As hereinbefore noted, it was alleged in the original petition that death resulted from an overdose of barbital and it was not until more than five years after Doctor McKenzie's death that it was alleged, in the second amended petition, that an overdose of bromides was the cause of death.

Before considering the testimony further it should be noted that under the double indemnity provision of the policy claimant is required to show not only that death resulted "from bodily injury effected solely through external, violent and accidental means" but that it so resulted "directly and independently of all other causes." Moreover, no claim for double liability could be maintained if death

resulted "directly or indirectly from infirmity of mind or body, from illness or disease."

It is well settled that in actions to recover for accidental death the burden of proof is upon the plaintiff to show that the death was accidental. (6 Cooley's Briefs on Insurance, p. 5283.) Indeed, there is much authority to support the proposition that in order to meet this burden of proof in actions to recover under double indemnity provisions such as the instant one, the claimant must show by "clear and convincing evidence" that the cause of death was other than that disclosed by the hospital records or the autopsy report, or that the latter was founded on an accident within the meaning of the policy. (*Merrill v. Phoenix Mut. Life Ins. Co.*, [Mass.] 26 F. Supp. 756, 757; *Jones v. Mutual Life Ins. Co. of New York*, [N. Y.] 113 F. 2d 873; *Phillips v. Travelers Insurance Co.*, 288 Mo. 175, 231 S. W. 947; *Massachusetts Protective Ass'n v. Mouber*, 110 F. 2d 203; *De Reeder v. Travelers Ins. Co.*, 329 Pa. 328, 198 Atl. 45; see, also, 6 Cooley's Briefs on Insurance, pp. 5287, 5288.)

In the Jones case, *supra,* the deceased was found by his wife lying in the bathroom. Accidental death was claimed. The court, in holding that the plaintiff failed to make out a case for the jury, said: "The most favorable view that might be taken of the evidence would be that death might have occurred either from an accidental fall or disease. . . . Where the evidence is circumstantial and it appears that injury may have resulted from one of two causes for one of which but not for the other defendant is liable, then the plaintiff cannot recover because this leaves the matter to conjecture." (p. 875.) In the Mouber case, *supra,* the deceased, who had heart trouble, backed his car over a curb and bumped a car behind him, and a doctor testified that the bump, *coupled with his condition,* could have caused death. Recovery was denied, and it was said that "evidence which is consistent with two conflicting hypotheses tends to support neither. If the plaintiff's evidence is equally consistent with the hypothesis that the death of the insured was accidental and with the hypothesis that it was not accidental, it is insufficient to sustain the verdict." (p. 206.)

The evidence upon which appellant relies in support of sufficiency may fairly be summarized as follows: The autopsy report contained a statement that the "cause of death is rather uncertain"; the deceased had theretofore taken bromides to relieve nervousness, in an effort to overcome alcoholism and upon several occasions this had

caused him to talk incoherently and had rendered him unconscious or semiconscious; an overdose of bromides can cause death; when the body was found there was a brownish or straw-colored fluid, streaked with blood coming from his mouth and nostrils; his hands and face had an abnormal color, pallor, or discoloration; there was a water or drinking glass on the floor not far from his hand which contained a brown fluid or was stained "brown," "greenish brown," or "brownish purple," and that two doctors gave their opinion, in answer to hypothetical questions, that death resulted from "an overdose of bromides."

In analyzing the evidence it will suffice in most part to summarize rather than quote it at length. As already noted, Doctor Williams' proof of death, submitted to the company in support of appellant's claim, gave "acute dilatation of the heart; acute myocarditis" as the cause of death. Both Doctors Harless and Wahl, pathologists, made such findings after post-mortem examinations, together with many other findings of organic disorders. It is true that Doctor Wahl's extended anatomical diagnosis and report contained the statement "the cause of death is rather uncertain," but in a deposition received in evidence he reiterated his opinion that death was caused by heart failure due to myocarditis, and testified that in stating "the cause of death is rather uncertain" he did not mean the immediate cause, but that the final cause—the basic cause back of the chronic heart condition—was rather uncertain. While Doctor Wahl was a defense witness, this statement was made in explanation of his report which had been introduced by the plaintiff.

The fact that Doctor McKenzie had taken bromides theretofore, which resulted in incoherent talk and unconsciousness or semiconsciousness might possibly be said to raise an inference that at eleven o'clock the night before his death he had taken bromides, though hardly a presumption that he had then taken or later took a dose of bromides which caused his death. This would seem to be especially true in view of the natural assumption that Doctor McKenzie, being a physician, knew what would be a medicinal dose of bromides. "Peacock's bromides," the sedative which appellant alleges had been used by Doctor McKenzie, can be bought at drug stores without a doctor's prescription. Doctor Fulton, for plaintiff, testified that "an excessive dose may cause death by its effect upon the organs of the body . . . and especially with respiratory depressant." Doctor Gripkey testified that "he never personally knew or verified a case

of anyone dying from an overdose of bromides," but that "there are such cases in medical literature." In considering the demurrer we are not here concerned with defendant's evidence on the point.

We find no probative substance to the testimony that there was a brownish or straw-colored fluid, streaked with blood, coming from the mouth and nostrils when the body was found. Mrs. McKenzie testified that on prior occasions when Doctor McKenzie was said to have been rendered unconscious from an overdose of bromides, she "saw fluids come from his mouth." She did not say what color such fluids were. Nor was there any medical testimony that a fluid discharge such as that here described is peculiar to the rare cases said to be reported in medical literature of death from bromides. Doctor Williams testified that the discharge of a "clear, straw-colored liquid" from the mouth is "a common thing where a body has lain in a heated room for a number of hours." However, Doctor Williams being a defense witness, we here disregard that testimony.

There was no medical or other testimony that the color or discoloration of the face and hands testified to in this case is an unusual color or discoloration observed in cases of death from overdose of bromides. Again, we are not here concerned with defendant's rebuttal evidence on this point.

As to the water or drinking glass on the floor, several witnesses testified it was stained by some liquid that had been in it. Whether the stains appeared to be fresh stains no one testified. All but one testified that there was no liquid in the glass. Appellant urges that one witness, when asked: "Anything in the glass?" answered: "This brown fluid was in there." And when asked as to the quantity of fluid, replied: "Wasn't hardly any." The witness, however, further testified on direct examination: "It was stained, and it looked like he was going for a drink of water when he fell." On cross-examination the witness said: "The glass I saw on the floor was empty. There was a dark brown stain in the bottom." In any event, there was no testimony, based on appearance, odor or otherwise, that there was or had been any bromides in the glass, or that the stains in the glass were bromide stains. There was not even any testimony that "Peacock's Bromides" in a drinking glass leaves a "brown," "greenish brown" or "brownish purple" stain.

There remains for consideration the opinion of the two doctors—given in answer to a hypothetical question—that death was due to

an overdose of bromides. The weakness of this testimony is that it faded out on cross-examination. Both doctors stated that they had based their answer on the assumption that Doctor McKenzie *had taken an overdose of bromides.* But a hypothetical question can only be based upon proven or apparent facts. There could be no assumption of an overdose of bromides—that was an essential part of the very thing appellant was seeking to establish. Moreover, both stated that if Doctor Wahl made a diagnosis of chronic myocarditis from an examination of the heart on post-mortem, it would change or modify their answer to the hypothetical question. That diagnosis was contained in Doctor Wahl's report which the appellant herself introduced as an exhibit.

There was no substantial evidence of any character to establish liability under the double indemnity provision. To find otherwise the jury would be compelled to presume or infer, in the absence of any evidence on the matter, that the drinking glass had contained bromides; that Doctor McKenzie had taken bromides from it; that the dose was an *overdose;* that such overdose was taken *accidentally* and that such accidental overdose was the cause of death without regard to the acute and chronic disease of vital organs disclosed by the post-mortem examination, or, as the policy has it, *"directly and independently of all other causes."* (Italics ours.) This would be piling presumption and inference upon presumption and inference. It is elementary that that may not be done and that a burden of proof may not be met by mere conjecture. (Couch on Insurance, 7026, § 2171; 1 C. J. 495, § 278; *Whiteker v. Wichita Rld. & Light Co.,* 125 Kan. 683, 265 Pac. 1103; *Phillips v. Travelers Insurance Co.,* 288 Mo. 175, 231 S. W. 947.)

The demurrer to plaintiff's evidence was properly sustained. The judgment is affirmed.

HARVEY, J., not sitting.