[No. 706-3.   Division Three.   October 25, 1974.]

BIRDIE E. ENGLEHART *et al., Appellants,* v. GENERAL ELECTRIC
COMPANY *et al., Respondents.*

*J. Donald Curran* (of *Delay, Curran & Boling*) and *Wil-
liam E. Hennessey,* for appellants.

*Frank Hayes Johnson* (of *MacGillivray, Jones, Clarke,
Schiffner & Johnson*), for respondents.

GREEN, C.J.—Plaintiffs brought this action against the
defendants to recover under certain life insurance policies
for the alleged accidental death of John F. Calhoun. A jury
found for the plaintiffs and indicated by answers to special
interrogatories that the evidence established (1) the death
of John Calhoun, and (2) his death was accidental. There-
after, the trial court granted defendants' motion for judg-

ment n.o.v. as to the finding of accidental death. Entry of this judgment presents the sole issue on plaintiffs' appeal and requires a thorough examination of all the evidence.

Accidental death is defined in the court's instructions as follows:

> The term "accidental death" as used in these instructions means death resulting from bodily injuries effected solely through external, violent and accidental means as a result of unusual, unexpected or unforeseen events. Death by disease or self-inflicted death would not be accidental within the meaning of this definition.

No error having been assigned to this instruction, it becomes the law of the case.

The evidence shows that John Calhoun was last seen between 11 a.m. and 12:30 p.m. on Saturday, July 18, 1970, when he had a cup of coffee with two friends at a restaurant in the Spokane Valley. One of these friends testified that he told them he had been shopping; he was going fishing that afternoon; and he was going to take his children fishing the next day. At that time he was carrying a sack from J. C. Penney's. On the date of his disappearance he had written checks to J. C. Penney and Valley Muffler Service.

Toward dusk the same day, a resident on the shore of Lake Coeur d'Alene observed an inboard-outboard boat adrift about 200 yards from shore. After watching the boat for 15 or 20 minutes without seeing an occupant, the resident and his son took their boat and went out to retrieve it. They observed that all of the mooring lines were properly tied; the ignition key was on; the throttle was approximately one-fourth open in a forward running position; and the gas tank registered empty. The mooring lines showed no signs of having been broken or cut—"they were as though someone got in the boat, unhooked it from the dock, put the ropes in and took off." They towed the boat to shore and notified the sheriff. This boat was owned by the insured, John F. Calhoun.

Calhoun's automobile was found at the Yacht Club where

he stored his boat. In the car were a pair of swimming trunks and a folder containing work orders from Calhoun's employer, General Electric Company. His wallet was not found in the car nor in the boat. Detective Teagan of the Spokane County sheriff's office testified they received a missing person report on Mr. Calhoun but were unable to locate him.

Other evidence showed that, in addition to taking his children fishing on Sunday, July 19th, Calhoun had arranged to take them by boat from Lake Coeur d'Alene to a birthday party at a friend's home on the Spokane River. Also, his checking account showed a balance of $332.92 which included a paycheck deposited to the account on the day before his disappearance.

Calhoun was born in 1927 and later graduated from high school. In 1949 he married plaintiff, Billie Bentley. They were divorced in 1963. Custody of their three children was awarded to the mother. In 1965 Calhoun married the plaintiff, Birdie E. Englehart. They were divorced in 1966. During the first divorce, Calhoun voluntarily admitted himself to Eastern State Hospital for 6 to 7 weeks; and after his release continued to occasionally visit a psychiatrist until January 1965. Calhoun was employed for 16 years by the defendant, General Electric Company, as an electrician and had seniority in his specialty. His general health was good and he had no history of heart or circulatory disorder. As a result, he was employed full-time and enjoyed a normal social life.

Witnesses described him as a normally quiet individual, very friendly, easy to talk to, even-tempered, peace-loving, and devoted to his three children and his 67-year-old mother with whom he resided. Each of his children confirmed his close relationship with them. On the Wednesday preceding Calhoun's disappearance, he took them boating and water skiing, as he frequently did. At that time he appeared normal, happy and jovial. The testimony shows that he always remembered the children on their birthdays and at Christmas time.

His mother testified that on the day of his disappearance, Calhoun had breakfast with her and she had no reason to believe her son was contemplating suicide or other disappearance as "he liked life too well." The defendants point out that she also testified that he was in "fair" health before his disappearance; had some allergy disorders; and that "lots of times" in the 12 months before his disappearance he complained of not feeling well, advising her he lost his appetite, and didn't feel like eating. However, a reading of all of the mother's testimony does not indicate any serious health problem and there is no medical testimony on this point. Further, the record indicates that two or three evenings before he disappeared he went through his personal effects and burned nearly all of them. However, this was not unusual as he periodically disposed of various personal items in this manner. The mother testified that a rifle and a suitcase were missing.

The jury found from all the evidence that Calhoun died from accidental causes. In granting the motion for judgment n.o.v., the trial court ruled there was sufficient evidence to support the jury's finding that Calhoun was dead; however, because there was no direct proof as to the manner of death, the evidence was insufficient to establish that his death was accidental as defined in the court's instructions.

The circumstances under which a motion for judgment n.o.v. may be granted is outlined in *Grange v. Finlay*, 58 Wn.2d 528, 529, 364 P.2d 234 (1961):

> Such a motion involves no element of discretion and will not be granted unless the court can say, as a matter of law, that *there is neither evidence nor reasonable inference from evidence sufficient to sustain the verdict.* In ruling on a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the party against whom the motion is made, and all material evidence favorable to the contention of the party benefited by the verdict must be taken as true. If there is substantial evidence supporting the verdict of the jury, as distinguished from a mere scintilla of evi-

dence, the verdict must stand. By "substantial evidence" is meant that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed.

(Italics ours.)

The effect of the trial court's ruling is to prevent a finding of accidental death (to the exclusion of every other means) as herein defined, by reasonable inferences in a situation where there is only circumstantial evidence of the manner of death. With this position, we disagree. *See Martin v. Insurance Co. of North America*, 1 Wn. App. 218, 460 P.2d 682 (1969).

Although the definition of "accidental death" in *Martin* differs from the one here, the overall effect of that decision is to recognize that accidental death, however it be defined, may be established by reasonable inferences from circumstantial evidence. In *Martin*, the insured was last seen on a steep and heavily wooded mountain side at the 3,000-foot level, under inclement weather conditions, without the aid of a compass and was inquiring as to directions. An organized search of the area for 8 days failed to reveal any trace of the insured, his clothing or his hunting equipment. The court had no difficulty in setting aside the judgment n.o.v. and holding that a jury could have inferred from the circumstances that the insured became inextricably lost and as a result unavoidably exposed to the elements that caused his accidental death.

In the instant case, the following evidence is undisputed. Those who last communicated with the insured were told that he was on his way fishing. His car was discovered at the Yacht Club; the boat was found adrift with the ignition on, the throttle at one-quarter speed in a forward running position; and the tie-ropes were all in place. Testimony by the insured's children indicated that he was not a good swimmer, but when he swam he put his wallet in the glove compartment of the boat. Calhoun's swim trunks were found in the car, but his wallet was not in the boat or in the car. The children also testified that on occasion the

insured had difficulty with the automatic lift of the propeller on the inboard-outboard motor, and that it was necessary for him to enter the water or lean over the back of the boat to correct the problem. Further, the jury was entitled to believe from all the evidence that the insured was in good health; had a great deal of love and affection for his children and was attentive to them; and he was not depressed, but in a healthy state of mind. In light of the foregoing, the jury reasonably concluded that the insured died accidentally as defined by the court's instruction. Thus, we find that the trial court properly submitted the issue to the jury, but erred in later determining the evidence to be insufficient.

■ Defendants contend that the inference of accidental death in this case is necessarily piled upon the inference that death did occur. In *Martin v. Insurance Co. of North America, supra,* as here, the defendant contended:

> [T]hat because of the two-fold nature of the ultimate fact—both of which are dependent upon circumstantial evidence—the jury was first asked to infer death from the proven facts and thereafter to infer the manner of death—and that this process constitutes "the piling of inferences upon inferences".

In response, the court determined that only radial inferences were involved, stating at page 221:

> If this process constituted plaintiff's logical development of the ultimate fact, we would be obliged to affirm the judgment. However, we do not so view plaintiff's proof. An inference is a logical conclusion or deduction from an established fact. Its characterization as a "necessary" or a "conflicting" inference is dependent upon the degree of certitude of the logical implication. . . . A jury will not be permitted to extrapolate conjecturally beyond a legal conclusion which is itself arrived at circumstantially by inference from a proven fact. . . . But, a given set of facts may radially project two (or more) separate inferences. In such event, one inferential conclusion is not pyramided upon another; each is drawn independently from the same evidence.

In the instant case, the inference of death and the inference of how the death occurred are radial inferences. The jury conclusion that the insured is dead does not by itself support a further inference that he died by accidental means. It is the circumstantial evidence surrounding the insured's disappearance that radiates both inferences. In other words, the fact that the jury found Calhoun's death to be accidental depends not upon the inferential conclusion of death, but upon the circumstances surrounding the disappearance.[1]

We are not unmindful of *Gardner v. Seymour*, 27 Wn.2d 802, 809, 180 P.2d 564 (1947), where the court noted:

> [I]f there is nothing more tangible to proceed upon than two or more conjectural theories under one or more of which a defendant would be liable and under one or more of which a plaintiff would not be entitled to recover, a jury will not be permitted to conjecture how the accident occurred.

This rule should be reserved for those cases where the inferences show equal support for opposing conclusions. *See Martin v. Insurance Co. of North America, supra* at 223. Construing the evidence and inferences therefrom most favorably to plaintiff herein, the jury could easily find that the weight of the inferences preponderate in favor of death by accidental means as defined by the court's instructions. *See Gero v. John Hancock Mut. Life Ins. Co.*, 111 Vt. 462, 18 A.2d 154 (1941).

Reversed and remanded for entry of judgment upon the verdict.

MUNSON and McINTURFF, JJ., concur.

---

[1] The following cases, cited by respondent, in which there was circumstantial evidence equally supportive of two inconsistent theories as to the manner of death, *Continental Cas. Co. v. Fountain*, 257 S.W.2d 338 (Tex. Civ. App. 1953) (broken arm or cancer); *McKenzie v. New York Life Ins. Co.*, 153 Kan. 439, 112 P.2d 86 (1941) (overdose of a drug or heart attack); *Tillotson v. Travelers' Ins. Co.*, 304 Mo. 487, 263 S.W. 819 (1924) (drowning, murder, or intentional disappearance), are not controlling.