## OCEAN ACCIDENT & GUARANTEE CORPORATION, Limited, v. MOORE.*
### No. 10545.

Circuit Court of Appeals, Eighth Circuit.
Aug. 13, 1936.

Joseph N. Hassett, of St. Louis, Mo., for appellant.

Maurice P. Phillips, of St. Louis, Mo., for appellee.

Before GARDNER and SANBORN, Circuit Judges, and NORDBYE, District Judge.

GARDNER, Circuit Judge.

This is an action at law brought by appellee as beneficiary in a policy of insurance in which the insured was her husband, John A. Moore. The petition is in two counts. The first seeks recovery for total disability to the insured prior to his death, while the second seeks recovery of the amount agreed to be paid on the death of the insured. Trial to a jury resulted in a verdict for appellee on each count, and from the judgment entered thereon this ap-

*Rehearing denied Oct. 6, 1936. Writ of certiorari denied 57 S. Ct. 235, 81 L. Ed. ——

peal has been taken. The parties will be referred to as they appeared below.

The policy insured John A. Moore, by occupation a lawyer, against loss or disability resulting directly, independently, and exclusively of all other causes, from accidental bodily injuries. If the injuries should result in death within twelve months from the date of the accident, the principal sum of $15,000 was agreed to be paid to the beneficiary. The policy also provides: "(b) If such injuries shall from the date of accident, continuously and completely disable and prevent the Insured· from performing any and every duty pertaining to his occupation, and during the period of such disability shall result in any of the above losses, the Company will pay the fixed indemnity specified therefor, and in addition the weekly indemnity hereinafter provided for the period between the date of the injury and the date of the loss."

The policy also· provides that if such injuries disable and prevent the insured from the date of the accident from performing any and every duty pertaining to his occupation, the insurer will pay a weekly indemnity of $50 for the first fifty-two weeks, and if the disability continues beyond fifty-two weeks, the insurer will increase the weekly indemnity 10 per cent. each additional fifty-two weeks until the increase shall amount to 50 per cent. of the original weekly indemnity. Thereafter, as long as the disability continues, the insurer agreed to pay the original weekly indemnity, plus the increase. The policy also provides that if the injuries continuously prevent the insured, from the date of the accident or immediately following total disability, from performing some material part of the duties pertaining to his occupation, the insured would pay, during such partial disability, not exceeding thirty weeks, a weekly indemnity of 50 per cent. of the amount payable for total disability. The policy also provides that written notice of the injury must be given to the insurer within twenty days after the date of the accident causing the injury, but failure to give such notice within the time provided is not to invalidate any claim if it should be shown not to have been reasonably possible to give such notice, and that notice was given as soon as reasonably possible. In the event of death of the insured, any accrued weekly indemnity is made payable to the beneficiary if surviving the insured. The policy does not cover any injury resulting directly or indirectly from disease.

The policy went into effect July, 24, 1930, and premium payments kept it in force until July 24, 1932.

At the conclusion of the testimony, defendant presented a demurrer to the evidence, requesting the court to instruct the jury that on each count of plaintiff's petition, under the pleadings, the law and the evidence, plaintiff was not entitled to recover and the verdict should be in favor of defendant. The court refused so to instruct, but submitted the case to the jury on instructions to which defendant saved certain exceptions. The assignments of error, however, present no claim of error in the court's instructions, and the substantial question presented for our consideration is whether the evidence is sufficient to sustain the verdict.

We do not weigh the evidence, but under the well-settled rule consider the evidence from the standpoint most favorable to the plaintiff because all disputed questions of evidence have been resolved by the verdict of the jury against defendant. Limbeck v. Interstate Power Co. (C.C.A. 8) 69 F.(2d) 249. Assuming, as we must, that the jury has resolved all disputed questions of fact in favor of the plaintiff, they may be stated substantially as follows:

In April, 1931, the insured was about fifty-one years of age. He was a lawyer in active practice in St. Louis, Mo. Prior to April, 1931, he had, with immaterial exceptions, the appearance of being a healthy, vigorous and well-preserved man. On April 13, 1931, while taking his morning exercises, he slipped and fell, striking the floor. From that time on to his death, he was not a well man. It is the injury received from this fall which must be the foundation of the causes of action on the policy. After the fall, he came down stairs with difficulty and had trouble in seating himself. He ate very little breakfast. The son, Randolph Moore, assisted him down the front steps and into his car. After driving down town and parking the car, the son assisted insured in walking. The insured could not get his back straightened up, and took very short steps. He did practically nothing but lie down most of the day. A case set for trial that day was continued. The son, who worked in the law office of insured, looked things up for his father in the books, and read them to him. Insured had a headache, held his

head a great deal, could not straighten his back, and his son thought his foot was "draggy." He took the insured home shortly after noon, which was unusual. The following day, the son and insured's wife assisted insured to dress, and the son took his father to the office, where he did about as he had done the preceding day. There was a day or two when the insured did not go to his office. He suffered acutely for about ten days, when his back improved and he was able to walk more normally. After ten days from April 13, insured spent full time at the office up to the night of May 7, 1931, and on May 1 and 2 he tried a case in the Circuit Court of St. Louis. He seemed to his son, who was present and helped, "greatly confused and suffered from a very severe headache throughout. He didn't seem to be able to collect his thoughts, though he did go ahead with the trial of the case." During meal time he lay down in the witness room, and the son brought him a lunch, but he ate little of it. After the trial of the case, he did practically nothing, though he did mail a motion for new trial on May 4, 1931, in the same case, and dictated some letters. He lay down in his office nearly all the time. If some very important individual or something important to his business came in, he would seat himself at his desk and talk to the individual for a few moments, and then would say that he was not feeling well, and the person would leave.

An office associate, R. J. Callahan, testified that he saw the insured about the office between April 13 and May 7, 1931, and noticed his condition; that he seemed to be dragging his leg, and from conversations, witness got the impression that he "was not so good mentally—I had the impression that he was slipping."

Insured complained of headaches, and kept rubbing his right arm. About three days after the fall, he went to an osteopath, who saw insured professionally on April 22, 24, 29, May 4 and 6. The osteopath administered treatment for relief of the right arm. There seemed to be no improvement and he dismissed the case as out of his line. During the treatment, he sent the insured to Dr. Levey for X-ray. Dr. Levey said the insured was limping and complained of pain over the lower part of the back and running down the right leg, and he said he seemed to have an expression of pain on his face. The X-ray disclosed nothing, but no X-ray was made of the head.

On April 25, 1931, insured wrote a letter in which he informed defendant of the accident and that he claimed he was entitled "to weekly indemnity, partly for total disability, and partly for partial disability." On April 30, he signed a notice of accident on a form furnished by defendant, in which he made answer to certain questions as follows:

"Are you totally or partially disabled by reason of such injuries? Yes.

"Totally—For how long approximately? 5 days.

"Partially—For how long approximately? two weeks and still continues."

These answers were in his own handwriting.

It is the contention of defendant that there is no evidence that the injuries from the date of the accident continuously and totally disabled and prevented the insured from performing any and every duty pertaining to his occupation until May 7. The lower court instructed the jury that total disability within the meaning of the policy meant disability to do all substantial and material acts necessary to be done in carrying on plaintiff's occupation of attorney at law, with duties of office, court, and traveling, as distinguished from trivial or incidental acts; that it meant inability to perform all duties necessary to the practical prosecution of the insured's occupation; that if the jury found that the insured could perform, during his lifetime, some trivial, incidental acts connected with the practice of law, with office duties, court duties and traveling in connection therewith, but was unable to perform any and every material and substantial act in the practical prosecution of his profession, they would be warranted in finding that he was totally disabled; but if they found that there were substantial and material acts necessary to be done in carrying on his occupation which the insured could have performed during the period in controversy, they would not be warranted in finding total disability. This instruction was not excepted to at the trial, nor is its correctness challenged here. It must be accepted as a correct statement of the applicable law. United States F. & G. Co. v. McCarthy (C. C.A.8) 50 F.(2d) 2. We think the evidence shows a condition warranting the jury in finding total disability, reserving for later consideration the question as to whether such total disability was caused

by the injuries received by insured on April 13, 1931.

Defendant places great stress upon the letter of April 25, 1931, and the notice of April 30, 1931. The statements in these documents to the effect that the insured was partially disabled are, of course, not consistent with the total disability upon which the verdict and judgment must rest. They were not made by the beneficiary, and it is not necessary to consider to what extent they may be binding upon her. In Travelers' Ins. Co. v. Melick (C. C.A.8) 65 F. 178, 187, 27 L.R.A. 629, this court held that where a beneficiary made a statement in a proof of loss, it was conclusive upon him only until he should give the insurance company reasonable notice that he was mistaken, after which it had the effect of solemn admission against interest. In that case, the beneficiary stated in the proof of loss that the insured "took a knife, and cut his throat. All evidence shows that the condition of his mind and his physical condition, that prompted the suicide, was caused by the shot wound." The evidence of the beneficiary, however, showed the death of the insured to have been caused by tetanus. The court held that ample notice that death was not caused by suicide was given in the plaintiff's pleadings. In the instant case, plaintiff's petition pleads total disability. The statements signed by the insured were admitted in evidence as admissions against interest, and defendant had the full benefit of them, but notwithstanding these admissions the jury found for plaintiff. A statement in a proof of death that is not true does not estop the beneficiary as a matter of law where the insurer is not prejudiced thereby. It is merely evidence to be considered and given such weight as the jury think it entitled to in connection with all other evidence in the case. Union Mutual Life Ins. Co. v. Payne (C.C.A.5) 105 F. 172; Supreme Lodge, K. of P. of W. v. Beck, 181 U.S. 49, 21 S.Ct. 532, 45 L.Ed. 741.

Defendant had other notice besides the petition that the claim was for total disability. It sent an adjuster to undertake to negotiate a settlement with the insured after the notice of April 30 was received, but insured told him he was not ready to settle. On January 20, 1933, insured's son wrote defendant, claiming total and permanent disability indemnity under the policy, beginning on or about April 13, 1931. On January 30 or 31, 1933, Dr. Deppe examined the insured and reported on his condition to the insurance company. On February 11, 1933, the day after the death of the insured, the son notified defendant of the death and of the claim of his mother, the beneficiary, for accidental death. On February 23, 1933, defendant wrote, denying liability and refusing to furnish forms for proof. It wrote again on June 28, 1933, in the same vein. Defendant has, therefore, shown no prejudice.

In Clarke v. Travelers' Ins. Co., 94 Vt. 383, 111 A. 449, 450, the insured in an accident policy filed proof of claim, alleging partial disability, and later sued for total disability. A verdict for total disability was sustained, and in the course of the opinion it is said: "The defendant's contention that the plaintiff was precluded by the proof of claim filed alleging partial disability from showing that his disability was in fact total and continuous to the time of the amputation cannot be sustained. Statements therein would stand as admissions against interest to be considered by the jury in determining the degree of plaintiff's disability, but they would not be conclusive of his right of recovery."

The jury may well have concluded, as it evidently did, that the insured was mistaken in his conclusion and that his disability was in fact total.

On May 7, 1931, the insured fell again in his office. From that time on until his death, February 10, 1933, there is no doubt that the insured was totally disabled. As to this accident, the lower court instructed the jury as follows: "You can not, so far as establishing the liability in this case is concerned, the date May 8, 1931, when the insured is alleged to have fallen in his office —or in the office of an associate—so far as establishing the liability is concerned, that date should be dismissed from your mind because the plaintiff is not entitled to recover in this case for injury, accidental injury, sustained on that date, if there was any such injury sustained on that day. We are not saying that you have to disregard that occurrence. You may keep that occurrence in mind as some evidence of the insured's physical condition subsequent to the vital day of April 13, 1931, as some evidence of his physical condition, and for that purpose it is proper for you to consider it. But you can not and should not permit recovery in this case on the theory that the insured sustained the accidental injury, resulting in this loss of his, on May 7, 1931."

On February 10, 1933, the insured drowned in the bathtub at his home. The evidence sustains the finding that the insured fell into the tub, that his physical condition, which, from July 4, 1931, included a paralysis of the right side, prevented his getting out of the tub, and that he drowned in the water in it.

Defendant's evidence tended to show that a clot of blood in the left coronary artery near the heart caused the death. Plaintiff had evidence, however, tending to show that the immediate cause of death was drowning, and that whether conscious or unconscious when he fell into the water, with his weakened right arm, partially paralyzed, under him, he was not able to extricate himself from the water. This testimony was given by plaintiff's expert, Dr. Miller, who on cross-examination testified that the coronary occlusion might have caused insured pain; it might have been a contributing factor toward his falling; it might have been the thing that caused him to fall and bump his head on the tub or faucet, or whatever happened to him; and might have contributed to getting him into the bathtub. Defendant insists that this shows that plaintiff's expert admitted that the cause of death was a blood clot. On cross-examination, the doctor also testified that in his opinion the clot did not cause the death, and he testified: "It might have been the thing that caused him to fall and bump his head on the tub or faucet or whatever happened to him, and may have contributed to getting him into the bathtub. I certainly would be willing to agree to all that, but I do not think it caused his death. It is not a fact that he would have died with that occluded coronary artery if he had been in bed or on the floor, and furthermore, it is entirely probable that this may have occurred during the struggle of this man in the water, trying to extricate himself in the act of drowning, or it may actually have been possible it was blood that clotted in their post-mortem."

Considering the entire testimony of this expert, it is possible that the jury had before it sufficient evidence to sustain the finding that the insured's condition, resulting from antecedent causes, was the proximate cause of his drowning in the bathtub. The theory of recovery for death is stated by the court as follows: "But if you find that the insured did suffer an accidental injury on April 13, 1931, and that as the result of that accident he suffered injuries which completely disabled him down to the 10th of February, 1933, and that he came to his death on that day as a result of those injuries, then this policy was in effect at the time of the death of John A. Moore."

The occasion for this instruction is apparent. The insured, it will be observed, did not die within twelve months of the date of the accident. There could be no recovery for the accidental death as an original fortuitous event, because, at the time of the insured's death, the policy had lapsed for want of payment of premiums. There could, however, be a recovery for death under the provisions of the policy if the accidental injuries from the date of the accident, continuously and completely disabled the insured, and, during the period of such complete disability, resulted in the death of the insured.

The controlling question, therefore, is whether the fall of April 13, 1931, caused or resulted in the total disability of the insured. If it did, the verdict on count 1 at least should be sustained. If the total disability ensuing resulted in or caused the death of insured, then the verdict on count 2 should be sustained. We therefore direct our attention to the causal relation of the first fall to the succeeding events.

This vital link in the testimony was attempted to be supplied by plaintiff through expert witnesses. In this connection, it should be stated that it is the contention of defendant that the disability of the insured was not caused by accident, but by progressive arteriosclerosis. So far as the evidence for plaintiff is concerned, the verdict must be sustained, if at all, on the expert testimony of Dr. M. W. Hoge and Dr. Dan Miller. We shall first refer to the testimony of Dr. Hoge, a nerve specialist. Referring to his examination of the insured on May 14, 1931, he testified as follows: "From my examination of Mr. Moore I believe the condition that I found in his right leg and right arm was due to a brain disturbance of the character of either a hemorrhage or blocking of one of the arteries. The two conditions give rise to practically the same result; * * * it is not possible with any certainty to determine whether the apoplectic seizure, as it is called, is due to a hemorrhage or whether it is due to a blocking of blood vessels. * * * It is my opinion that a hemorrhage which might have occasioned the condition that I found Mr. Moore suffering with could have been caused by a fall. In my opinion a fall may be productive of a hemorrhage or thrombus."

It is observed that this testimony leaves it entirely a matter of speculation as to what caused insured's disability. The witness does no more than express a possibility that a fall may have caused the disability. As said in Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 66 S.W.(2d) 561, 565: "Assurance of possibility is not of itself, however, sufficient to make a submissible case, upon the issue of cause and effect, for a plaintiff who has the burden of proof upon that issue."

Evidence that the condition might have been caused by either injury or disease, without showing as to which of the possible causes did produce the condition, furnishes no basis upon which the jury might determine that issue. Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.(2d) 644. We may therefore eliminate the testimony of Dr. Hoge in our consideration of this issue. It has not sufficient probative force "to make a submissible case."

Dr. Miller testified that he made three calls at insured's home subsequent to April 13, 1931, the first on June 24, 1932, the second on June 27, 1932, and the third on July 2, 1932. He also attended the autopsy on the insured's body February 11, 1933, and he testified that the spleen, pancreas, liver, kidneys, and stomach appeared to be normal; the lungs showed a definite evidence of edema. There was nothing wrong with the heart, except two small whitish scars in the musculature, and some hard red blood, a clot about one centimeter long, in a branch of the left coronary artery. The brain had three areas of degeneration on the left side, but the right side of the brain was entirely normal in every respect. He was asked to assume that the insured had sustained an injury of some character to his brain that had resulted in evidence of paralysis in his right arm and right leg, as early as May 7, 1931, and then was asked to state what would be the distinguishing features with respect to whether the paralysis at that time was caused by a pathological or diseased condition of the brain, or from traumatic means. He answered that in his opinion the lapse of time since those changes took place in the brain, back in 1931, to the period of time when there was an opportunity to examine the brain, would have obliterated the evidence that would permit any one to say positively whether "this thing came on in an hour, or a day, or a day or two, and would have prevented us from saying positively whether it was a blocking of a certain area that came from a plug inside a blood vessel, or whether it was a hemorrhage that occurred alongside those blood vessel trunks and spread out into tissues and caused a destruction of the brain tissue which gradually caved in from the top; but there might be presumptive bits of evidence along the way that would give the doctor some idea, not a hard and fast opinion, as to what had occurred."

In answer to another hypothetical question, the witness said: "The immense difference in the two sides of the brain—the fact that the right side was entirely all right except such blood vessel changes as you could normally expect in a man of that age—they were even a little better than you would expect in a man of that age—and the fact that the left side of his brain was all wrong—it had caved in areas, degenerated areas and some blood vessel changes —would lead me to believe that something happened to the left side of his head that didn't happen to the right. And knowing the man personally and professionally over a number of about four years preceding this period in 1931, and seeing the kidneys, and liver, and spleen and other organs that did not show hardening of the arteries, I am quite firmly convinced that this trouble in the left side of the brain arose from some force."

The doctor was then asked a hypothetical question in which he was asked to assume, among other things, that, " * * * Mr. Moore sustained a fall; that on the morning of April 13th, * * * while he was taking his morning exercises in a room in his home, that he slipped on a rug and fell heavily on the floor." And he was asked to assume that on the evening of May 7, 1931, " * * * he was seated in a chair, with his feet on a table, .* * * that the chair went out from under him while his feet were on the table; he fell heavily on the floor; * * *" besides a description of his physical condition and activities up to the time of his death, and was asked whether in his opinion, "a rupture could have occurred in the brain of Mr. John A. Moore which produced the hemorrhage that in turn produced the paralysis about which we have hypothesized the facts and which you had an opportunity to observe upon examination?" The witness said: "It is my opinion, from my own personal experience with a large number of head injuries, from seeing and assisting in a large number of autopsies, and

from a practice of twenty-five years, and from a peculiar experience with a good many paralytic cases, that these falls did cause the changes in the left side of this man's brain, cerebellum portion—(the cerebrum portion)—that caused his disability, paralysis and inability to talk and things that happened to him."

It is first to be observed that the witness' conclusion was based, among other things, upon the fall of April 13, 1931, and the fall of May 7, 1931. The court, however, took from the jury the evidence with reference to the fall which occurred on May 7. So far as establishing any liability was concerned, the value of the opinion of an expert is dependent upon what there is back of it. This opinion, being hypothetical, must stand or fall with the existence of the facts upon which it is predicated. Eliminate from the facts embodied in the hypothetical question, the fact of the fall which occurred May 7, 1931, the opinion is wholly devoid of probative value or force. The jury could not be permitted to hazard an opinion as to what the view of the doctor might have been on the question of whether insured's disability was caused by the fall of April 13 alone. But we think this evidence cannot be said to be substantial for another reason.

The only description of the accident embodied in the question to this witness was to the effect that on the morning of April 13, while insured was taking his morning exercises in a room at his home, "he slipped on a rug and fell heavily on the floor." And if the accident of May 7 is to be considered, it is observed that the only description furnished to the doctor as to this accident is that "the chair went out from under him while his feet were on the table. He fell heavily on the floor." The description of these physical facts seemed to disclose a comparatively simple and slight accident. It is not claimed that he fell any considerable distance, or with any particular force, but simply that he slipped and fell to the floor. There was no evidence of any injury to the head, and there was no claim of any such injury. The insured reported not only to his own family, but to the insurance company, that he sustained some sort of a sacroiliac injury, and on the day of the injury he went to the office and within a day or two tried a lawsuit.

Under these simple undisputed facts, we think the opinion of this witness is opposed to physical facts, scientific principle,

and common knowledge, and we conclude that on this vital issue there is no substantial evidence to sustain the verdict of the jury. The judgment appealed from is therefore reversed, and the cause is remanded to the lower court, with directions to grant the defendant a new trial.