**JONES v. MUTUAL LIFE INS. CO. OF NEW YORK.**

**SAME v. PRUDENTIAL INS. CO. OF AMERICA.**

Nos. 11454, 11455.

Circuit Court of Appeals, Eighth Circuit.

Aug. 6, 1940.

Rehearing Denied Aug. 31, 1940.

Arnot L. Sheppard, of St. Louis, Mo. (Joseph Renard and Wilder Lucas, both of St. Louis, Mo., on the brief), for appellant.

**874**

James C. Jones, **Jr.,** of St. Louis, Mo. (James C. Jones, **Lon O.** Hocker, and W. A. Welker, all of St. Louis, Mo., on the brief), for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and MOORE, District Judge.

MOORE, District Judge.

These are actions on the double indemnity or accidental death benefits of two life insurance policies of $10,000 each, issued by appellees to and upon the life of James H. Jones, in which the appellant was the beneficiary. The insured died on January 2nd, 1938. Following his death the appellant made demand upon appellees both for the life insurance benefits and the accidental death benefit of said policies. Appellees paid the life insurance benefits of the policies but denied and disclaimed any liability to the appellant under the accidental death benefits.

These actions were consolidated for trial below, although a separate judgment was entered in each case. The cases were submitted to the jury and a verdict returned in favor of the defendants. From the judgments entered on those verdicts, the appellant, who was plaintiff below, appeals. It will be convenient to refer to the parties as they appeared in the lower court.

The provisions involved in the policies which are, for all practical purposes, identical, are to the effect that if the insured shall die directly from bodily injuries, independently and exclusively of all other causes, and if such injuries were effected solely through external, violent and accidental means (one of the policies uses the term "causes" rather than "means") and not directly or indirectly from bodily or mental infirmity or disease of any kind, within sixty days thereafter, each company would pay to the plaintiff the sum of $10,000 in addition to the face of the policy.

In her petitions the plaintiff alleged that the insured's death, which occurred on January 2, 1938, was the result of injuries sustained on that date in an accidental fall in the bathroom of the apartment where he and the plaintiff resided. The defendants in their answers denied that the insured sustained an accidental fall, or that his death was the result of any injury sustained in such a fall, and further alleged that insured's death was the result, directly or indirectly, of disease.

The plaintiff on this appeal claims, first, that the case was made out for the jury, but complains that in submitting the case to the jury the court gave erroneous instructions; that the court erred in permitting defendants' counsel to ask certain interrogatories of the veniremen on voir dire; that it erred in refusing to permit plaintiff to inquire hypothetically as to the opinion of an expert witness with reference to whether or not the insured's fall in the bathroom could have caused his death, and that the court erred in refusing to strike out an answer by one of defendants' witnesses.

In our view of this record it will not be necessary to consider the question of the correctness of the court's instructions, nor its other rulings, because it is our opinion plaintiff failed to make out a case entitling her to go to the jury, and defendants' motions for a directed verdict should have been granted. If this is true, and plaintiff had no case, then any error in the instructions was not prejudicial. Lappin v. Prebe, Mo.Sup., 131 S.W.2d 511; W. B. Grimes Dry Goods Co. v. Malcolm, 164 U.S. 483, 17 S.Ct. 158, 41 L.Ed. 524.

The plaintiff testified at the trial that she awakened about 3:30 o'clock in the morning of January 2nd, 1938, and observed the insured not in bed. That she then heard heavy breathing in the bathroom, which adjoined the bedroom, and found her husband lying in the corner of the bathroom, near the bath-tub, which is in the southwest corner of the bathroom; that one of the electric lights in the bathroom was on; that the insured was lying on the floor on his chest, and that his head was jammed against the tub and the floor, and that his neck was frightfully twisted, with his chin very high in the air; that his head was really up against the tub, and that it seemed like it was pushed between the floor and the tub; that she was only conscious of his neck being horribly twisted and his chin and his lips against the bath-tub; that his face was practically against the bath-tub, and that his left hand was out near a shoe box which was turned over towards him.

Plaintiff testified that at the time of her husband's death he had a slight cold in his head for which he was taking Bromo-Quinine; that he had not suffered of any illness; had not complained of any illness, shortness of breath or pain in the chest; that he was an active man who had gone hunting during the previous month and lost no time from his work recently; hadn't

been confined to his home on account of illness; that he had never made any complaint as to walking hurting or bothering him; that he had no trouble with breathing at night or night sweats, or anything of that sort; that he was fifty-two or fifty-three years old.

Plaintiff further testified that she called Dr. Raines, the insured's physician; that he came but the insured was dead when the doctor got there.

Dr. Raines testified he found no indication of any bruise, cut or abrasion of the skin; that the insured's neck seemed to be twisted, but it was not broken.

An autopsy was held which disclosed no bruise, wound, contusion or abrasion anywhere on the body; that the brain and lungs were oedematous; that the arteries were sclerotic; that the kidneys showed evidence of a chronic nephritis; that the heart was hypertrophied, infiltrated with fat; that there was a narrowing in the lumen of the coronary artery, and the coroner's physician (Dr. Martin) who performed the autopsy testified that his opinion was that the cause of death was coronary sclerosis, contributory oedema of the brain. This witness also testified to other diseased conditions of the heart, blood vessels and kidneys. So far as the medical testimony was of an affirmative character, it was practically all to the same effect.

After the autopsy performed by Dr. Martin, one of the coroner's physicians, there was an autopsy attempted by Dr. Downey L. Harris, who testified he could not make a satisfactory examination of the brain. The body had been prepared for burial by the undertaker before this autopsy was attempted, and the doctor, among other things, testified: "the condition of the viscera did not permit a satisfactory examination, but as far as could be determined there was no gross evidence of disease in the liver, lungs or kidneys. No opinion could be formed concerning the gastro-intestinal tract". Dr. Harris's testimony did not take into consideration the diseased condition of the kidneys or the oedema of the lungs and brain which were found in the first autopsy. The doctor was asked the following: "Well, doctor, assume that in this case the brain was found to be oedematous and the lungs were found to be oedematous at the autopsy, and that kidneys were found to be—to have chronic nephritis, there is present a perfect picture of heart failure, assuming those facts, doesn't it? A. Well, yes * * *."

 There were no physical facts which indicated any injury from a supposed fall. The burden of proof was upon the plaintiff. The most favorable view that might be taken of the evidence would be that death might have occurred either from an accidental fall or disease. If from disease there was no liability, and where the evidence is circumstantial and it appears that injury may have resulted from one of two causes, for one of which but not for the other the defendant is liable, then the plaintiff cannot recover because this leaves the matter to conjecture. Massachusetts Protective Ass'n, Inc. v. Mouber, 8 Cir., 110 F.2d 203; Warner v. St. Louis & Merrimac River Ry. Co., 178 Mo. 125, 77 S.W. 67; Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Ocean Accident & Guaranty Corp. v. Moore, 8 Cir., 85 F.2d 369; Metropolitan Life Ins. Co. v. Gosney, 8 Cir., 101 F.2d 167. But in the case at bar there is a total absence of evidence showing that the death of the insured resulted from accident, and the evidence does show conclusively that the death of the insured resulted from disease.

In Phillips v. Travelers' Insurance Co., 288 Mo. 175, 231 S.W. 947, 950, circumstantial evidence was relied upon, and in the course of the opinion it is said: "It is true that 'proof by circumstantial evidence is not mere presumption.' But that would only be true where such circumstances clearly pointed to the accidental character of the fall, and tended to exclude the theory that it resulted from a stroke of apoplexy."

The Phillips case seems to be a controlling authority in the instant case. In the more recent case of Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, 646, the court held that the plaintiff had failed to produce evidence warranting submitting the case to the jury where an alleged heart impairment might have been due to one of two causes for only one of which the defendant would have been liable.⁶ In the course of that opinion it is said: "The sum total of the evidence is that the condition of plaintiff's heart at the time of the trial might or could have been caused by shock such as one receives in an accident, or by the ravages of the disease which plaintiff had at and prior to the date of his injury. If the heart condition was caused by ravages

of the disease, defendant is not liable therefor. The burden [of proof] was on the plaintiff to show the cause. Evidence that the condition might or could have been caused by either injury or disease without any substantial showing as to which of the possible causes did produce the condition, furnishes no basis from which a jury could determine the cause."

See, also, Pedigo v. Rosenberry, 340 Mo. 724, 102 S.W.2d 600; Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 66 S.W.2d 561; Bates v. Brown Shoe Company, 342 Mo. 411, 116 S.W.2d 31; Lappin v. Prebe, Mo. Sup., 131 S.W.2d 511.

Dr. R. B. H. Gradwohl testified he had never seen an oedematous brain in connection with trauma without visible evidence in the form of severe contusion of the scalp and nearly always a fracture of the skull.

Dr. John C. Salter testified he had examined insured in connection with an application for insurance on December 21, 1935, and found his blood pressure at least 10 points above normal; Dr. Salter further testified that he had heard the testimony with respect to oedema of the brain and lungs and nephritic kidneys, as well as the condition of the heart, as described by Dr. Martin, and that in his opinion it presented a picture of heart failure; that he did not think a man could have an oedematous brain affected by a blow without some evidence of this blow on the head; that if he were to assume that a microscopic examination of the coronary arteries and heart showed no more diseased condition than one would expect to find in the progressive changes of a man of that age, he would not necessarily exclude the heart as a cause of death because the whole picture—the oedema of the lungs and the brain, the kidney condition and the hardening of the arteries, it all goes together. Being asked if he then looked at another picture of the heart and it showed there was nothing wrong with it would, he still think it was heart disease, Dr. Salter replied: "Well, I should think the heart was the contributing factor to it. At any rate, that is, the failure of the action of the heart"; and being asked "Well, what would be the main factor then—there has to be a main factor there, to have a contributory one?" he answered, "Well, he had nephritis and an arteriosclerosis".

Dr. Howard Rusk testified that he had examined the insured in 1928, and found his blood pressure was 138 over 98 and he examined him again in 1930 and found his blood pressure 146 over 108; that he thought that a definitely increased blood pressure for a man of insured's age. He further testified, "You showed me Dr. Martin's report a while ago and after having studied that and taking into consideration the oedematous brain and lungs, the nephritic kidneys, the heart being infiltrated with fat and the narrowing of the lumen of the coronary arteries and his sudden death on January 2, 1938, that is the picture you see in cardio-vascular-renal disease—disease of the heart and kidneys. * * * In my opinion the oedema of the brain could not have resulted from the trauma without some evidence of a bruise or contusion on the scalp. In deaths from heart failure it is common to find an oedema of both the brain and the lungs. That together with the nephritic kidneys presents a complete picture of death from a cardio-vascular-renal disease."

Dr. Hollis N. Allen testified that he was a specialist in pathology; that it was inconceivable to him that an oedematous brain of the character shown at the autopsy could have been produced by trauma without external evidence of violence; that from the findings as reported by Dr. Martin and the autopsy by Dr. Rusk, the death was the result of a cardio-vascular-renal condition, with a terminal cardiac failure; that oedema of the brain is usually found in cardiac failure, as well as oedema of the lungs.

The only medical testimony in conflict with that above quoted heretofore was that of Dr. O. C. Raines, the insured's physician, who testified that in his opinion the insured died of asphyxiation; that by asphyxiation he meant the breath was shut off; that he did not think it was brought about by any condition of the heart or arteries; that he thought the shutting off of the breath was the spasm of the muscles of the neck made enough pressure on the trachea with his head rotated the way it was, to shut off the man's wind, and he was asphyxiated. Dr. Raines was not an impressive witness in any respect. He testified, first, that when he arrived at the Jones home he found insured lying on his stomach and his face rotated around as if he had a broken neck; that he was so sure insured had a broken neck that he called Dr. Harris to go and examine that neck; that he did not go to investigate it afterwards and did

not go to the autopsy, but that Dr. Harris having informed him the insured did not have a broken neck that he did not think he had a broken neck. When asked if the insured had an abrasion of the skin, Dr. Raines answered, "I would have to roll that body over, lift his head to see"; being asked then, "Weren't you interested in trying to find out, Doctor?", he answered, "No. I knew it was an accidental death, and that the case belonged to the coroner and not to me. That is what I still think".

Defendants introduced and read in evidence a certified copy of the death certificate by the Bureau of Vital Statistics of the State of Missouri, which stated that the principal cause of insured's death was coronary sclerosis, and that the contributory cause of such death was oedema of the brain nontraumatic. Section 9060, R.S. Mo.1929, Mo.St.Ann. § 9060, p. 4199, provides that "any such copy of the record of a * * * death, when properly certified by the state registrar to be a true copy thereof, shall be prima facie evidence in all courts and places of the facts therein stated".

The Supreme Court of the State of Missouri, in Simpson v. Wells, 292 Mo. 301, 237 S.W. 520, 525, 529, held that such a death certificate was admissible in evidence to establish the cause of death and was prima facie evidence thereof. The court in that connection said: "After carefully reading the authorities heretofore cited, we hold that, where a certificate is required to be filed with the registrar from either the coroner or attending physician, the Legislature intended in both sections 6670 and 6671 [1909 (sections 5802, 5803, R.S. Mo. 1919, Mo.St.Ann., §§ 9046, 9047, pp. 4189, 4191)] that all those matters required by law to be stated in the certificate were to be taken as prima facie evidence 'in all courts and places of the facts therein stated,' as contemplated in section 6684, R.S. 1909 (section 5816, R.S. 1919 [Mo.St.Ann. § 9060, p. 4199]). Unless the coroner's certificate * * * is treated as prima facie evidence as to those matters required to be incorporated therein, it would be utterly useless as a public document."

To the same effect is Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S.W. 1043.

Bearing in mind that Dr. Harris, the plaintiff's principal medical witness, testified that he was unable to determine either the direct or indirect cause of insured's

death from the autopsy which he performed, it would seem clear that the prima facie case established by the official death certificate is not overcome or refuted by the evidence circumstantial or otherwise.

It would seem obvious that it would take a succession of inferences to permit a finding for the plaintiff, and the courts of Missouri have repeatedly held that cannot be permitted. Phillips v. Travelers' Insurance Co., 288 Mo. 175, loc. cit. 185, 231 S.W. 947.

There being no evidence in the record of an accidental fall and no evidence of a bodily injury, we are of the opinion that the plaintiff failed to sustain the burden of proof, therefore, did not make out a submissible case. The judgments were for the right parties and are therefore affirmed.